SO ORDERED.

Dated: September 16, 2021

Daniel P. Collins, Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RICHARD PAUL BROWN and<br>BELINDA GAIL BROWN,<br><br>           Debtors. | Chapter 7<br><br>Case No. 2:18-bk-00723-DPC<br><br>Adversary No. 2:18-ap-00057-DPC |
| K.A. FUCIARELLI, a married individual dealing with his sole and separate property; and THE FUCIARELLI GROUP, LLC, an Arizona limited liability company,<br><br>           Plaintiffs,<br>v.<br><br>RICHARD PAUL BROWN and BELINDA GAIL BROWN, husband and wife,<br><br>           Defendants. | **Findings of Fact and Conclusions of Law** |

Plaintiffs K.A. Fuciarelli ("Dr. Fuciarelli") and The Fuciarelli Group, LLC (collectively "Plaintiffs") filed an Amended Complaint (DE 68) in this action to Determine the Dischargeability of Debt under 11 U.S.C. § 523(a)(2)(A) and (B) against debtors Richard P. Brown ("Mr. Brown") and Belinda G. Brown (husband and wife) (collectively the "Defendants"). Through an order dated March 25, 2019 (DE 107), the Court dismissed Dr. Fuciarelli's claim under 11 U.S.C. § 523(a)(2)(B), leaving the claim under 11 U.S.C. § 523(a)(2)(A) for trial.

The case came before the Court for trial on August 23, 2021. Having considered the evidence presented, and the law as it applies to the facts established, the Court now makes these findings of fact and conclusions of law.

## Findings of Fact

1. Dr. Fuciarelli resided in Maricopa County, Arizona at all times material to this action. He filed this action in connection with his sole and separate property.

2. The Fuciarelli Group, LLC is an Arizona limited liability company that engaged in transactions in Maricopa County at all times material to this action.

3. Defendants are the debtors in the above bankruptcy action and at all times material to the Amended Complaint's allegations were Arizona residents.

4. At all material times, the Defendants were married and Mr. Brown acted for the benefit and on behalf of his sole and separate property and marital community. Through the fraud described below, he benefited his sole and separate property and his marital community with Belinda G. Brown.

**A. Nature of Action**

5. This case involves a $1 million investment that Plaintiffs were fraudulently induced to make in a company named Hot Salsa Interactive, LLC ("Hot Salsa"). As represented by Mr. Brown, Hot Salsa developed mobile-phone apps and provided computer-technology services to businesses and the federal government. Until Plaintiffs invested, the company's sole member and owner was Mr. Brown. Mr. Brown was Hot Salsa's sole manager.

6. Mr. Brown represented that Plaintiffs' $1 million would be used as business working capital and to hire new employees and expand Hot Salsa's business. Instead, over half of the money was diverted to pay the Defendants' delinquent federal taxes and other personal expenses including their home mortgages in Arizona and Australia.

7. Prior to this action, Plaintiffs sued Defendants in Maricopa County Superior Court Case No. CV2016-017253 for common-law fraud and securities fraud. After the Defendants' bankruptcy stayed the state-court action, Plaintiffs filed this action.

**B. Background to the Investment**

8. Mr. Brown represented himself to Plaintiffs as a successful businessman who owned Hot Salsa, which Mr. Brown claimed was a growing business with federal contracts and other customers. He claimed that the company could become that much more successful if he had additional working capital to hire new programmers.

9. Dr. Fuciarelli perceived that Mr. Brown's lifestyle corroborated his claimed success.

10. The Defendants' appearance of success was a façade. Hot Salsa was not a successful company. By 2014, Hot Salsa and the Defendants owed over $300,000 in back taxes and had an outstanding federal tax lien of $191,000 for their 2012 taxes.

11. Hot Salsa's and Defendants' desperate financial straits motivated Mr. Brown to mislead Plaintiffs about the use that he would make of their investments and the nature of Hot Salsa's business.

12. Over the years, Dr. Fuciarelli and his wife became friends with the Defendants and socialized with them. Dr. Fuciarelli trusted Mr. Brown enough that he asked him to be his second daughter's godfather. Mr. Brown agreed and met with Dr. Fuciarelli's priest.

13. During 2014, Dr. Fuciarelli and Mr. Brown began discussing an investment in Hot Salsa. In October of that year, Mr. Brown had his attorneys prepare

3
Case 2:18-ap-00057-DPC   Doc 196   Filed 09/16/21   Entered 09/16/21 14:59:34   Desc
Main Document    Page 3 of 10

a term sheet for the investment. The investment was to be an equity investment in Hot Salsa, which was organized as a limited-liability company. Mr. Brown told Dr. Fuciarelli the investment and its paperwork had to comply with SEC rules and regulations.

14. By the end of November 2014, Mr. Brown had persuaded Dr. Fuciarelli to advance $100,000 to Hot Salsa as a bridge loan. Dr. Fuciarelli then made two additional bridge loans of $200,000 each in December of that year. In February 2015, the investment paperwork and SEC documentation was completed and Dr. Fuciarelli's company, The Fuciarelli Group, LLC, advanced another $500,000 through two wire transfers. At that point, the entire $1 million was credited as a 10% equity investment in Hot Salsa owned by The Fuciarelli Group, LLC.

15. Mr. Brown immediately used the third bridge loan in December 2014 to write a $190,000 check to the IRS for the Defendants' delinquent federal taxes.

16. If Plaintiffs had known that Mr. Brown intended to use their investments to pay his taxes or personal living expenses, they would have never invested any money and they would have refused to sign Hot Salsa's Operating Agreement and Subscription Agreement.

17. Hot Salsa's Operating Agreement (¶ 5.8) provided that Mr. Brown would receive a salary of $12,500 a month as compensation for his services as the Hot Salsa's manager. Mr. Brown paid no attention to the salary cap. He treated Hot Salsa's checking account as a personal account and withdrew from that account, with his wife, between $30,000 to $40,000 a month as direct draws, ATM withdrawals, and payments of the Defendants' personal living and recreational expenses.

18. Mr. Brown caused checks to be written to pay his personal taxes, home mortgage ($8,558/month), utilities and landscaping, country-club and health-club fees, and payments on his Tesla ($2,004/month) and his wife's Mercedes ($1,058.28/month). Without Dr. Fuciarelli's knowledge, between November 2014 and May 2015, taxes and other personal expenses totaling $504,647 were paid on the Defendants' behalf through

Hot Salsa's checking account.

19. In short, it was only by diverting Dr. Fuciarelli's investment funds to pay their personal bills that the Defendants were able to continue their extravagant lifestyle.

**C. Dr. Fuciarelli Discovers Mr. Brown's Fraud**

20. Dr. Fuciarelli began discovering Mr. Brown's fraud in May 2015 when he was preparing to invest another $1 million. Dr. Fuciarelli asked to see some of Hot Salsa's financial records. In response, Mr. Brown sent him some of Hot Salsa's checking records for the period after he had invested.

21. A series of text messages between Dr. Fuciarelli and Mr. Brown two days after the checking records were sent capture Dr. Fuciarelli's anger and shock. He wrote that he was "totally spooked" by what he was seeing; that "you let me down huge;" and demanded that his money be repaid. The text exchange reads:

> 5/19/15 4:02 p.m.
>
> **Dr. Fuciarelli:**
> Rick, I need for you to know that I am totally spooked at what I am seeing on the statements. I would ask that for our next meeting you have the statements in hand for Jan thru April with a written description for each debit and credit paid. Before then, can you please tell me what the 55k and 110k checks on the Feb statement were for? Thank you
>
> **Mr. Brown:**
> I'll have statements in hand and go over everything. Sorry to have spooked you. Hopefully when we meet you will feel comfortable
>
> **Dr. Fuciarelli:**
> Please have written description for each. And let me know about the checks for 55 and 110 K in advance
>
> **Mr. Brown:**
> Taxes paid
>
> Other check for 55k was a loan repayment
>
> **Dr. Fuciarelli:**
> That's for 2012 taxes? What loan for 55 k if not sba?

**Mr. Brown:**
I borrowed money from my mother and paid her back.

I'll show you a copy of the Check

**Dr. Fuciarelli:**
You never told me that you borrowed money from her, only sba. You also never said you owed back taxes. Investment was supposed to be for working capital, hiring key employees, etc!

**Mr. Brown:**
My apologies. I'm not trying to hide anything from you. I can go over every item with you

**Dr. Fuciarelli:**
You hid everything from me! What is wrong with you!

**Mr. Brown:**
Perhaps we talk in person.

**Dr. Fuciarelli:**
You let me down huge! How could you?? Why would you??

5/20/15 7:15 a.m.

**Dr. Fuciarelli:**
Please indicate when I can expect a check from you this month that returns my one million dollar investment made to hot salsa

22. By May 2015, Plaintiffs' entire $1 million investment in Hot Salsa had been dissipated by Defendants. Contrary to Mr. Brown's representations to Plaintiffs that the $1 million would be used for working capital and to hire new employees, at least $504,647 of the money was used to pay the Defendants' delinquent taxes, mortgages, auto payments, and other personal expenses.

23. Further, during the course of discovery, Mr. Brown admitted that Hot Salsa had no government contracts as he had previously represented to Dr. Fuciarelli.

24. Mr. Brown misrepresented to Dr. Fuciarreli that Hot Salsa had government contracts.

25. Mr. Brown failed to disclose to Dr. Fuciarelli the Defendants' significant tax debt and other liabilities, which if they had been known to Dr. Fuciarelli, would have stopped Plaintiffs from investing any money with the Defendants or Hot Salsa.

26. Dr. Fuciarelli would not have invested any money with Hot Salsa if Mr. Brown had not made the misrepresentations set forth above or if Mr. Brown had disclosed the above material information to Dr. Fuciarelli.

27. Regardless of the source of the $1 million investment, it was the parties intent from the outset that The Fuciarelli Group, LLC would be credited the full $1 million for its investment in Hot Salsa.

## Conclusions of Law

28. Plaintiffs' complaint is based on 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) prohibits the discharge of any debt for money or property obtained by "false pretenses, a false representation, or actual fraud." The Ninth Circuit uses a five-part test to determine whether a debt is nondischargeable under § 523(a)(2)(A):

- The debtor made a representation;
- The debtor knew the representation was false when made;
- The debtor made the misrepresentation with the intention of deceiving the creditor;
- The creditor relied on the debtor's representation;
- The creditor sustained a loss as a proximate result of the debtor's false representation.

*In re Britton*, 950 F.2d 602, 604 (9th Cir. 1991); *see also Ghomeshi v. Sabban (In re Sabban),* 600 F.3d 1219, 1222 (9th Cir. 2010).

29. Plaintiffs carried their burden of proof on all elements of their claim against the Defendants under 11 U.S.C. § 523(a)(2)(A) and established that they are entitled to relief. *See Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009); *Grogan v. Garner*, 498 U.S. 279, 287-88, 111 S. Ct. 654, 660 (1991). The Fuciarelli Group, LLC is entitled to a judgment, which will be entered in the court

record by the Court with these findings of fact and conclusions of law, concluding that The Fuciarelli Group, LLC is entitled to a $1 million judgment against Defendants, plus pre-judgment interest from the dates of the investment, through the date of the judgment at the federal rate, plus post-judgment interest from the date of the judgment at the federal rate, plus allowable court costs.

30. *Mr. Brown's representations*. Mr. Brown represented to Dr. Fuciarelli that "we would be using the money for working capital and to hire employees." Similarly, the Operating Agreement and Subscription Agreement represented and confirmed that all capital contributions would be used for business purposes. Mr. Brown also represented that Hot Salsa did business with the government under federal contracts.

31. *The representations' falsity*. Contrary to what he represented, Mr. Brown immediately began using Dr. Fuciarelli's investments to pay $300,000 in delinquent personal taxes and to pay his family's living and other personal expenses. Likewise, contrary to Mr. Brown's representation about federal contracts, Hot Salsa was not a party to any federal contracts and had no revenue from federal contracts. Nor did the company do any work under any federal contracts. Mr. Brown knew that his representations were false, and he made them with the intention and purpose of deceiving Plaintiffs.

32. *Materiality*. By misrepresenting his intended use of Dr. Fuciarelli's investments, Mr. Brown made material misrepresentations. *See* RESTATEMENT (SECOND) OF TORTS § 525, cmt. c (1977) (statements that a person has an intention that he does not have are false representations). Misrepresentations regarding the intended use of an investor's money have repeatedly been held fraudulent. Falsely representing that Hot Salsa had federal contracts that had produced hundreds of thousands of dollars in revenue was also a material misrepresentation by Mr. Brown to Plaintiffs.

33. *Intent to deceive*. As evidenced by how Mr. Brown immediately began spending Dr. Fuciarelli's investments to pay Mr. Brown's taxes and other personal expenses, Mr. Brown intended to deceive Dr. Fuciarelli when he told him that the money

would be used for business working capital, to expand the business, and to hire new employees. The hundreds of thousands of dollars that Mr. Brown used to pay personal taxes and living expenses could not be used for Hot Salsa's business purposes. Mr. Brown's intent to mislead Dr. Fuciarelli is also evidenced by his conduct in having Dr. Fuciarelli sign an operating agreement and subscription agreement that falsely stated that Plaintiffs' investments would be used for business purposes. Mr. Brown's intent to mislead is also evidenced by his false representation that Hot Salsa had federal contracts from which it generated substantial revenue when no such contracts or revenue existed.

34. *Reliance*. In deciding to invest, Dr. Fuciarelli trusted Mr. Brown and justifiably relied on Mr. Brown's representations that Hot Salsa had federal contracts and that Plaintiffs' investments would be used for business working capital and to hire new employees. Plaintiffs would never have invested with Mr. Brown or signed an operating agreement or subscription agreement if Dr. Fuciarelli had known that Mr. Brown was misleading him about the federal contracts or that Plaintiffs' investments would be diverted to pay the Defendants' taxes and living expenses.

35. *Loss and damages*. As a result of being misled by Mr. Brown, Plaintiffs' entire $1 million investment was lost. Defendants filed bankruptcy, making no attempt to reorganize or continue Hot Salsa's business. Plaintiffs have received no return on their investments, which are now worthless. The Fuciarelli Group, LLC has sustained damages in the principal amount of $1 million USD and this damage is the proximate result of the misrepresentations made to Plaintiffs by Mr. Brown.

36. *Marital-community liability*. Fraudulent or malicious conduct by a spouse binds the marital community when a direct benefit to the community is shown. *Selby v. Savard*, 655 P.2d 342, 349 (Ariz.1982).

37. *Marital-community benefit*. The Defendants' marital community directly benefited from Mr. Brown's conduct by using Dr. Fuciarelli's money to pay taxes owed by them, as well as by using the money to fund their living expenses (mortgage payments, utilities, and landscaping) and recreational expenses (golf-club and health-

club fees). *In re Rollinson*, 322 B.R. 879, 882 (Bankr. D. Ariz. 2005) (finding direct community benefit where funds embezzled by spouse were used to pay family expenses).

38. Plaintiffs' demand for punitive damages is denied as Plaintiffs have failed to carry the burden of proof required for an award of punitive damages.

39. The Fuciarelli Group, LLC is entitled to pre-judgment interest from the Defendants at the federal rate under 28 U.S.C. § 1961(a) from the time of the investments through the date of the judgment in this matter. *See In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994) (*citing Purcell v. United States*, 1 F.3d 932, 942-43 (9th Cir. 1993)) ("Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole.").

40. The Fuciarelli Group, LLC is entitled to post-judgment interest from the Defendants at the federal rate under 28 U.S.C. § 1961(a) from the date of the judgment until paid in full.

41. The Fuciarelli Group, LLC is entitled to recover their taxable costs from the Defendants.

42. The judgment to be entered against the Defendants and in favor of The Fuciarelli Group, LLC is not discharged through the Defendants' bankruptcy.

43. Judgment shall be entered against the Defendants and in favor of The Fuciarelli Group, LLC. Mr. Brown shall be individually liable and the community property of the Defendants but will not be entered against Mrs. Brown's sole and separate property outside of her community property with Mr. Brown for which Mr. Brown has no interest or entitlement.

Based on the forgoing, **IT IS ORDERED** directing counsel for Plaintiffs to prepare and provide to this Court a form of judgment consistent with these Findings of Fact and Conclusions of Law.

**DATED AND SIGNED ABOVE**